# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Cease, :
               Appellant :
                         :
        v. : No. 519 C.D. 2019
                         : ARGUED: February 13, 2020
Housing Authority of Indiana County :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION BY**
**SENIOR JUDGE LEADBETTER**[1]             **FILED: February 19, 2021**


      Mary Cease appeals from an order of the Court of Common Pleas of Indiana County that affirmed the decision of the Housing Authority of Indiana County (1) denying her application for housing assistance under the United States Department of Housing and Urban Development's (HUD) Housing Choice Voucher Program, commonly referred to as Section 8[2] and (2) concluding that she was a new applicant to the program under Section 13661 of the Quality Housing and Work Responsibility Act (QHWRA), 42 U.S.C. § 13661. The Authority's denial was based upon the statement in her application for admission that she used medical marijuana. We affirm the order to the extent that it determined that Cease was a new applicant to the Section 8 program, vacate it to the extent that it affirmed the Authority's denial of Cease's application, and remand this matter for the Authority to carry out its mandate under Section 13661 of QHWRA: (1) to establish standards

---

[1] This opinion was reassigned to the author on September 18, 2020.

[2] Section 8(a) of the Housing and Community Development Act of 1974, 42 U.S.C. §1437f(a).

for determining when and on what basis admission is prohibited for an applicant legally using medical marijuana pursuant to a valid Medical Marijuana Identification Card; and (2) to apply those standards when determining Cease's eligibility for Section 8 housing.

Cease is a disabled veteran of the United States Navy, with no prior criminal record. She suffers from post-traumatic stress disorder and chronic back pain for which she has endured multiple surgeries. (Apr. 11, 2019 Trial Court Op. at 1.) Pursuant to Section 501 of the Pennsylvania Medical Marijuana Act,[3] the Pennsylvania Department of Health issued Cease a Medical Marijuana Identification Card. It is undisputed that her card is valid and that Pennsylvania law permits her to obtain and use medical marijuana to treat her conditions.[4] (*Id*. at 2.)

Over the years, Cease has participated in at least two federally funded and subsidized housing programs. The first is HUD's Section 8 program, which the Authority administers in Indiana County. Cease participated in the Section 8 program while living in Nanticoke, Pennsylvania and Wilkes-Barre, Pennsylvania, and applied for admission once again in Indiana County. (*Id*.) The second is the United States Department of Agriculture's (USDA) rural rent supplement program,[5] pursuant to which Cease currently lives at Clymer House Apartments in Clymer, Pennsylvania. Although the USDA's program offers a rental assistance subsidy

---

[3] Act of April 17, 2016, P.L. 84, 35 P.S. § 10231.501.

[4] Section 303(a) of the Pennsylvania Medical Marijuana Act provides generally that the use or possession of medical marijuana is lawful and that "[n]otwithstanding any provision of law to the contrary, use or possession of medical marijuana as set forth in [the Act] is lawful within this Commonwealth." 35 P.S. § 10231.303(a).

[5] Section 514 of the Housing and Community Development Act of 1974, 42 U.S.C. §1490a, created the USDA's rural rent supplement program.

comparable to what HUD offers qualified residents in metropolitan areas, HUD's regulations do not govern the USDA's program. (*Id.*)

In November 2017, Cease submitted an "Initial Application for Housing Assistance – All Programs" to the Authority for Section 8 housing. (Nov. 30, 2017 Initial Application; Reproduced Record "R.R." at 15a.) In its acknowledgment, the Authority advised Cease that it was placing her on a waiting list with an average waiting time of six months to one year and that "[t]he application process and requirements for eligibility are explained in the policies available for your review at our office." (Nov. 30, 2017 Letter at 1; R.R. at 17a.) In April 2018, the Authority informed Cease that there was an opening in Section 8 housing and requested that she provide a full application to determine her eligibility. (Apr. 10, 2018 Letter at 1; R.R. at 19a.) Cease complied, including a copy of her Medical Marijuana Identification Card with the application.

In denying the application, the Authority stated: "We must deny program participation as marijuana is still considered to be an illegal substance by the Federal government and costs associated with marijuana medical treatments *cannot* be considered in calculation of adjusted income." (June 13, 2018 Letter at 1; R.R. at 37a) (emphasis in original). At Cease's request, informal and formal hearings followed. Ultimately, the Authority upheld its denial based solely on the illegality of marijuana under federal law. (Sept. 26, 2018 Letter at 1; R.R. at 279a.) In so doing, the Authority agreed that Cease's income was well below its "extremely low" threshold and conceded that she met the income standards for Section 8 housing.[6] The Section 8 Coordinator for Indiana County, Holly Hall, testified that

---

[6] Derived from Social Security benefits, Cease's annual income was $9,240 and below the "extremely low" income level of $13,450. (Sept. 18, 2018 Hearing, Notes of Testimony "N.T." at 20; R.R. at 58a.)

3

the Authority denied Cease admission based on the federal government's classification of marijuana as an illegal drug and HUD's memos regarding the use of medical marijuana. (Sept. 18, 2018 Hearing, Notes of Testimony "N.T." at 49-50; R.R. at 87a-88a.) In particular, Hall seemed to rely upon Exhibit 9, directed to all public housing agencies and specifically pertaining to the Section 8 program. In the 2011 memo, HUD sought to provide guidance regarding the use of medical marijuana in states that have enacted laws permitting the use of medical marijuana and stated that new admissions of medical marijuana users was prohibited. (*Id*., Ex. 9; R.R. at 4a.) Further, HUD stated that state laws legalizing medical marijuana directly conflict with the admission requirements set forth in QHWRA and are thus subject to federal preemption.[7] (*Id*.)

On appeal, the trial court took additional testimony confirming Cease's status as a former Section 8 program participant in Luzerne County before moving to Indiana County. Following legal argument, it affirmed the Authority's denial of Cease's application for Section 8 housing and determination that she was a new applicant to the program. Cease's appeal to this Court followed.

Cease raises two issues, one with three subparts. In summary and reordered for ease of analysis, the first issue is whether Cease is a new applicant under Section 13661 of QHWRA or an existing participant under Section 13662.[8] If Cease is a new applicant, then she poses the issue of whether Section 13661 requires that the Authority deny her housing based on legal medical marijuana use or whether

---

[7] The memo lists fourteen states and the District of Columbia as having laws that legalize the use of medical marijuana. In 2011, Pennsylvania was not one of those states. Currently, there are at least thirty-three states and the District of Columbia that have legalized medical marijuana.

[8] Implicit in this issue is the parties' belief that Section 13662 of QHWRA affords a public housing agency discretion to terminate the tenancy or assistance to an existing participant who the agency or owner determines is illegally using a controlled substance.

4

it may exercise discretion. If the decision to deny housing on that basis is discretionary, then she poses the issue of whether the Authority should afford her accommodation for a disability under the Pennsylvania Human Relations Act (PHRA)[9] and the Pennsylvania Medical Marijuana Act. Cease's second issue is whether the lawful use of medical marijuana constitutes "illegally using a controlled substance" such that the use can form the basis for exclusion from the Section 8 program.

Congress created the Section 8 program in 1974 for "the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing" by providing low-income families with assistance payments, or subsidies, to enable them to rent units in the private housing market. Section 8(a) of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f(a). Pursuant to the program, HUD funds and regulates state or local governmental public housing agencies by distributing federal funds to the agencies, which, in turn, distribute the funds by contracting with property owners to subsidize a portion of a program participant's rent. *See* 42 U.S.C. § 1437f.

In 1998, Congress enacted QHWRA, which, *inter alia*, amended the Housing and Community Development Act of 1974[10] by requiring public housing agencies to establish standards to consider when determining admission to and termination from the Section 8 program. *See* 42 U.S.C. §§ 13661-13664. Section 13661(b)(1)(A) of QHWRA, "Screening of applicants for federal assisted housing," provides:

> (b) Ineligibility of illegal drug users and alcohol abusers.

---

[9] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

[10] 42 U.S.C. §§ 1401-1440.

(1) Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing, as determined by the Secretary, *shall establish standards that prohibit admission to the program* or admission to federally assisted housing for any household with a member--

(A) who the public housing agency or owner determines is illegally using a controlled substance.

42 U.S.C. §13661(b)(1)(A) (emphasis added). Section 13662(a)(1) of the QHWRA, 42 U.S.C. § 13662(a)(1), "Termination of tenancy and assistance for illegal drug users and alcohol abusers in federally assisted housing," provides:

(a) In general. Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing (as applicable) shall establish standards or lease provisions for continued assistance or occupancy in federally assisted housing that allow the agency or owner (as applicable) to terminate the tenancy or assistance for any household with a member--

(1) who the public housing agency or owner determines is illegally using a controlled substance[.]

42 U.S.C. §13662(a)(1).

As for which of the aforementioned provisions of QHWRA applies to Cease, we note that she was a participant in the USDA's rural rent supplement program when she applied for Section 8 housing in Indiana County. In other words, she was neither an existing Section 8 participant nor a participant in any federally subsidized housing program administered by the Authority at the time of her Section 8 application. Consequently, we determine that the Authority properly treated Cease

6

as a new applicant to the Section 8 program such that the screening provision in Section 13661 of QHWRA applied. We turn to an analysis of that provision.

As noted above, Section 13661(b)(1)(A) of QHWRA provides that the Authority "shall establish standards that prohibit admission to the program[.]" 42 U.S.C. §13661(b)(1)(A). Notably, there is a difference between "shall establish standards that prohibit admission" and "shall prohibit admission." Otherwise, the term "establish standards" is entirely meaningless. The object of statutory construction is to ascertain and to effectuate legislative intent. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). "[W]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Generally, the best indication of legislative intent is the plain language of a statute. *Malt Bevs. Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144, 1149 (Pa. 2009). *See also U.S. v. Gonzales*, 520 U.S. 1, 6 (1997) (Where "[g]iven a straightforward statutory command, there is no reason to resort to legislative history.").

By way of contrast, Section 13663(a) of QHWRA, pertaining to sex offenders, provides that "[n]otwithstanding any other provision of law, an owner of federally assisted housing *shall prohibit admission* to such housing for any household that includes any individual who is subject to a lifetime registration requirement under a State sex offender registration program." 42 U.S.C. § 13663(a) (emphasis added). Clearly, there is no discretion in prohibiting admission to such applicants. Accordingly, we construe the mandate in Section 13661(b)(1)(A) of QHWRA as allowing for flexibility to determine when and on what basis admission is prohibited, rather than mandating an outright prohibition. In other words, for purposes of Section 13661(b)(1)(A), the Authority must establish standards for

7

determining when and on what basis admission is prohibited for a Section 8 housing applicant who the Authority determines is illegally using a controlled substance. *See Nation v. Trump*, 818 F. App'x 678, 679-80 (9th Cir. 2020) ("QHWRA requires that owners of federally-assisted housing establish certain occupancy standards pertaining to illegal drug use for residents. *See generally* 42 U.S.C. §§ 13661-62."). Such standards must take into account factors such as the nature of the substance, i.e., whether it is clearly unlawful or in an unclear legal state such as that involved here; the reason for such use; whether it is being used in accordance with legal requirements; other factors concerning the applicant's background, including behavior during any prior residence in federally subsidized housing; and the presence or absence of any prior criminal record.

As for marijuana's legal status, the federal Controlled Substances Act (CSA)[11] classifies marijuana as a Schedule I controlled substance and it is unlawful for any person to knowingly or intentionally possess a controlled substance. Section 841(a)(1) of the federal CSA, 21 U.S.C. § 841(a)(1). Although there have been considerable efforts to reclassify marijuana under federal law, it has remained a Schedule I drug ever since its initial classification. Additionally, there has been resistance to efforts to make exceptions for the use of medical marijuana in federally-funded public housing. *See Nation v. Trump*, 395 F. Supp. 3d 1271 (N.D. Cal. 2019), *aff'd*, 818 F. App'x 678 (9th Cir. 2020) (where former HUD housing fund recipient claimed that HUD's application of the federal CSA against medical marijuana was unconstitutional, court confirmed that QHWRA referred to the CSA to define the term "controlled substance," that the CSA defined that term as a drug or other substance in one of its five schedules, and that marijuana was classified as a Schedule

---

[11] 21 U.S.C. §§ 801-971.

8

I drug under the CSA); *Forest City Residential Mgmt. v. Beasley*, 71 F. Supp. 3d 715 (E.D. Mich. 2014) (where Section 8 housing recipient was legally using medical marijuana under state law, court acknowledged that the CSA contained no provision allowing for the medical use of marijuana, held that the CSA preempted the Michigan Medical Marihuana Act,[12] and determined that the Fair Housing Act[13] did not require a federally assisted housing complex to grant the recipient a reasonable accommodation to use medical marijuana in such a complex).

Nonetheless, we are not bound by decisions of lower federal courts in other jurisdictions. Cease possesses a valid Pennsylvania Medical Marijuana Identification Card authorizing her to legally obtain and use medical marijuana under medical supervision, and the Authority does not dispute that she has a valid medical basis for her use and that it is properly prescribed and supervised. Consequently, we find the term "illegally using a controlled substance" to be ambiguous here where her use is prohibited by the federal government but permitted under state law.[14] Criminal law is primarily a matter for the states to determine

___

[12] Mich. Comp. Laws §§ 333.26421 - 333.26430.

[13] 42 U.S.C. §§ 3601-3631.

[14] Of course, even in the Commonwealth's body of laws, there are statutory conflicts and/or legislative failures to act with respect to accommodations for users of medical marijuana. In *Harrisburg Area Community College v. Pennsylvania Human Relations Commission*, ___ A.3d ___ (Pa. Cmwlth., No. 654 C.D. 2019, filed October 29, 2020) ("*HACC*"), this Court considered the effect of HACC's drug-testing requirement for candidates in its nursing program on a nursing student lawfully using medical marijuana under the Pennsylvania Medical Marijuana Act. We addressed the issue of whether the anti-discrimination provisions of the PHRA and the Pennsylvania Fair Educational Opportunities Act (PFEOA), Act of July 17, 1961, P.L. 776, *as amended*, 24 P.S. §§ 5001-2010, required accommodation of the student's lawful use of medical marijuana. We held that the legalization of medical marijuana in Pennsylvania in the Pennsylvania Medical Marijuana Act did not require an accommodation for its use under either Section 5(i)(1) of the PHRA, 43 P.S. § 955(i)(1), or Section 4(a)(3) of the PFEOA, 24 P.S. § 5004(a)(3), noting that the General Assembly could have amended the language of those acts to require **(Footnote continued on next page…)**

9

within their own jurisdictions. "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). As the Pennsylvania Supreme Court recently observed:

> [T]he core principle of federalism recogniz[es] dual sovereignty between the tiers of government." *See United States v. Davis*, 906 F.2d 829, 832 (2d Cir. 1990) ("The states and the national government are distinct political communities, drawing their separate sovereign power from different sources, each from the organic law that established it. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses."). In enacting the [Pennsylvania Medical Marijuana Act], the Pennsylvania Legislature proceeded pursuant to its independent power to define state criminal law and promote the health and welfare of the citizenry.

*Gass v. 52nd Jud. Dist.*, 232 A.3d 706, 714 (Pa. 2020). Consequently, "while possession and use of marijuana remains illegal under federal law even for medical purposes, . . . the federal [CSA] does not (and could not) require states to enforce it." *Id*. at 714.

In *Gass*, our Supreme Court unanimously declared that the Lebanon County Court of Common Pleas, 52nd Judicial District's "Medical Marijuana

---

accommodation but chose not to do so. *Id*. at ___, slip op. at 13 and 15. In her concurring opinion, Judge Covey urged the General Assembly to amend both the PHRA and the PFEOA so the benefits it created in the Pennsylvania Medical Marijuana Act "for the citizens of this Commonwealth are not illusory or applicable only in limited circumstances; thereby, creating an egregious result as is demonstrated in the instant case." *HACC*, ___ A.3d at ___ (Covey, J. concurring), slip op. at 1. Judge Covey opined that "[t]he conflict among these statutes has created an absurd result in requiring Pennsylvania citizens to choose the benefits of medical marijuana or the protections of the PHRA and the PFEOA." *Id*. at ___ (Covey, J. concurring), slip op. at 2-3.

10

Policy" prohibiting the active use of medical marijuana by individuals under court supervision, such as probationers, was, in both its original and amended forms, contrary to the immunity afforded under the Pennsylvania Medical Marijuana Act and, therefore, could not be enforced. In other words, the Court determined that a local policy could not usurp a state law simply by reference to a federal law such as the federal CSA. *Id*. Accordingly, the *Gass* Court held: "While the circumstances are certainly uneasy -- since possession and use of medical marijuana remains a federal crime -- we find that the [52nd Judicial] District cannot require state-level adherence to the federal prohibition, where the General Assembly has specifically undertaken to legalize the use of medical marijuana for enumerated therapeutic purposes." *Id*. We believe the same is true of the Authority.[15]

Moreover, the pertinent provisions of QHWRA are based on the obsolete and scientifically flawed premise that marijuana "has no currently accepted medical use in treatment in the United States" and that "there is a lack of accepted safety for use of marijuana under medical supervision." Section 812(b)(1)(A-C) of the federal CSA, 21 U.S.C. § 812(b)(1)(A-C). *See also U.S. v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) (recognizing that there is no medical necessity

---

[15] In *Beasley*, 71 F. Supp. 3d 715, the United States District Court for the Eastern District of Michigan considered how much deference to afford a January 2011 memorandum opinion issued by HUD to the Office of Fair Housing and Equal Opportunity regarding the medical use of marijuana and reasonable accommodation in federal public and assisted housing. Concluding that the HUD memorandum was not a statute, regulation, or formal judicial interpretation, the federal district court rejected the higher level of deference set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Instead, the federal district court concluded that the HUD memorandum was a more informal medium not intended to have the force of law and, therefore, afforded it the lesser level of deference set forth in *Skidmore v. Swift & Company*, 323 U.S. 134, 140 (1944). Accordingly, the federal district court, per *Skidmore*, gave weight to "HUD's conclusion that a medical marijuana accommodation [was] not reasonable under the Fair Housing Act because it would constitute a fundamental alteration in the nature of a [public housing agency] or owner's operations." *Beasley*, 71 F. Supp. 3d at 730.

11

exception to the federal prohibition against manufacturing and distributing marijuana). In contrast, the General Assembly in Section 102(1) of the Pennsylvania Medical Marijuana Act declared: "Scientific evidence suggests that medical marijuana is one potential therapy that may mitigate suffering in some patients and also enhance quality of life." 35 P.S. § 10231.102(1). Consequently, given the current circumstances regarding the medically accepted use and ambiguous status of medical marijuana, establishment of fair and reasonable standards regarding the use of that substance under medical supervision is particularly called for here.

Accordingly, we affirm the trial court's order to the extent that it determined that Cease was a new applicant but vacate the order to the extent that it affirmed the Authority's denial of Cease's application. We remand this matter to the trial court with directions to remand to the Authority to do what QHWRA mandates and establish fair and reasonable standards for determining in what circumstances admission to Section 8 housing is prohibited for an applicant who is legally using medical marijuana under state law, and to apply those standards with respect to Cease's individual circumstances when determining Cease's eligibility for the Section 8 program.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

12

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Cease,                          :
                 Appellant      :
                           :
         v.                :    No. 519 C.D. 2019
                           :
Housing Authority of Indiana County  :

# **O R D E R**

AND NOW, this 19th day of February, 2021, we hereby AFFIRM the order of the Court of Common Pleas of Indiana County, in part, VACATE the order, in part, and REMAND this matter to the trial court with directions to remand to the Housing Authority of Indiana County in accordance with the foregoing opinion.

Jurisdiction relinquished.

 

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Cease,                          :
                    Appellant       :
                                     :   No.  519 C.D. 2019
              v.                     :
                                     :   Argued:  February 13, 2020
Housing Authority of Indiana County  :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


DISSENTING OPINION
BY JUDGE McCULLOUGH                          FILED:  February 19, 2021


I must respectfully dissent.  The Majority goes to great lengths to explain why Congress's use of the phrase "shall establish standards that prohibit" in section 13361 of the federal Quality Housing and Work Responsibility Act (QHWRA),[1] means a Public Housing Authority (PHA) has "flexibility" to decide whether to admit an illegal drug user (as defined in the federal Controlled Substance Act[2] (CSA)) into a Section 8 housing program.[3]  By avoiding the rules of statutory

---

[1] 42 U.S.C. §13661.

[2] 21 U.S.C. §§801-971.

[3] Section 8(a) of the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. §1437f(a).

interpretation, the Majority assigns to the phrase "shall establish standards that prohibit" a meaning that Congress plainly did not intend.

The Majority also disregards some very basic constitutional and jurisprudential concepts to arrive at the desired conclusion that Mary Cease (Cease), a user of medical marijuana, is not "illegally using a controlled substance" under the QHWRA. The fact that Pennsylvania's Medical Marijuana Act[4] (MMA) legalizes the use of medical marijuana in limited situations is immaterial to the disposition of this case. The CSA (which illegalizes medical marijuana as a Schedule I drug) applies here because the QHWRA is a federal statute.

## Interpretation of the QHWRA

The Section 8 housing program is a federally funded and supervised rent subsidy program for low-income tenants which is administered by the United States Department of Housing and Urban Development (HUD). The QHWRA is a federal statute. It establishes the parameters for a PHA, such as the Housing Authority of Indiana County (HAIC), to follow when considering admission to, and termination from, the Section 8 housing program. *See* 42 U.S.C. §§13661-13664.

Section 13661 of the QHWRA, titled "Screening of applicants for federally assisted housing," applies to new applicants.[5] By its plain language, section 13661 of the QHWRA *requires* owners of federally assisted housing to *deny admission* to a new applicant if she, or a household member, is illegally using a

---

[4]Act of April 17, 2016, P.L. 84, 35 P.S. §§10231.101-10231.2110.

[5] I have no objection to the Majority's conclusion that Cease was a "new applicant" to the Section 8 program.

controlled substance. With regard to "admission to the program," section 13361(b)(1)(A) provides, in this regard, as follows:

> Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing, as determined by the Secretary, ***shall establish standards that prohibit admission*** to the program or admission to federally assisted housing for any household with a member--
>
> > (A)***who the public housing agency or owner determines is illegally using a controlled substance***;
>
> > ****

42 U.S.C. §13661(b)(1)(A) (emphasis added).

In contrast to the mandatory grounds for ***prohibiting admission*** to a Section 8 program set forth in section 13661, section 13662 of the QHWRA, titled "Termination of tenancy and assistance for illegal drug users and alcohol abusers in federally assisted housing," grants the PHA ***discretion*** to determine when and on what basis an ***existing participant's*** tenancy may be terminated if she is illegally using a controlled substance or abusing alcohol. Section 13662(a)(1) provides, in this regard, as follows:

> Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing (as applicable), ***shall establish standards*** or lease provisions for continued assistance or occupancy in federally assisted housing ***that allow*** the agency or owner (as applicable) ***to terminate the tenancy*** or assistance for any household with a member--

> (1) *who the public housing agency or owner determines is illegally using a controlled substance*;

> \*\*\*\*

42 U.S.C. §13662(a)(1) (emphasis added).

In my view, the phrases "***shall establish standards <u>that prohibit</u>***" (section 13661) and "***shall establish standards <u>that allow</u>***" (section 13662) in the sections dealing with illegal drug use make it clear precisely when Congress intended for a PHA to have discretion and when a PHA lacks that discretion.

Congress has a strict drug policy when it comes to the admission of current drug users (as defined by the CSA) into Section 8 housing. As stated by the federal courts, the import of the QHWRA and its accompanying regulations "is to protect public housing from criminal elements, especially drug activity, which could adversely affect the community." *Bennington Housing Authority v. Bush*, 933 A.2d 207, 213 (Vt. 2007*). See also Eastern Carolina Regional Housing Authority v. Lofton*, 789 S.E.2d 449, 452 (N.C. 2016) (observing that, "like everyone else, individuals who live in federally subsidized housing are entitled to be free from 'any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises'"). When it comes to deciding whether to ***admit a current drug user*** into a Section 8 housing program, PHAs have no discretion. They must deny admission.[6] *See Campbell v. Minneapolis Public Housing Authority,* 168 F.3d 1069, 1076 (8th Cir. 1999) (holding that the Minneapolis Public Housing Authority was "***obligated to exclude [applicant] from public housing if it 'ha[d] reasonable cause***

---

[6] Notably, federal regulations permit PHAs to overlook ***drug history*** and ***prior drug convictions*** if the person is no longer engaging in drug abuse or has been rehabilitated. 24 C.F.R. §960.204(a)(1). But here, it is undisputed that Cease is a ***current*** user of medical marijuana.

*to believe' that, at the time of his application, he was using illegal drugs or abusing alcohol in a manner that 'may interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents of the project'*") (emphasis added).

Contrariwise, when it comes to ***eviction***, *i.e.*, the potential ***displacement*** of an ***existing tenant*** and/or her entire household, PHAs are given discretion to "***establish standards <u>that allow</u>***" those tenants or their families to remain in Section 8 housing despite the violation, for example, by issuing warnings, or setting probation periods. This is because of the hardship that arises when tenants lose their housing. *Bennington Housing* (observing that a PHA certainly may evict an entire family for the misdeeds of one member, but it need not do so); *Lofton* (holding that housing authority was required to exercise its discretion before pursuing tenant's eviction from federally subsidized apartment for lease violation arising from third party's drug-related activity).

Despite the clarity with which Congress has indicated when a PHA has discretion, the Majority concludes that section 13661 of the QHWRA allows for "flexibility" to determine when and on what basis admission is prohibited, rather than mandating an outright prohibition to current users of illegal drugs.

The Majority's interpretation is based on its observation that Congress used the phrase "***shall prohibit***" in another section of the QHWRA (prohibiting sex offender's admission to Section 8 housing). Section 13663(a) of the QHWRA states that "notwithstanding any other provision of law, an owner of federally assisted housing ***shall prohibit*** admission to such housing" to registered sex offenders. 42 U.S.C. §13663(a) (emphasis added).

The Majority concludes that, given the different wording, the two phrases, "***shall prohibit***" (in section 13663) and "***shall establish standards that***

*prohibit*" (in section 13661), must have different meanings. Comparing the language of section 13661 (admission to Section 8 housing) with section 13663 (prohibiting sex offender's admission to Section 8 housing), the Majority concludes that, if Congress intended for Section 8 admission to be denied to current drug users, then it would have stated this as plainly as it did in section 13663 by using the phrase "*shall prohibit*." The Majority reasons that since Congress did not use the words "*shall prohibit*" in section 13661, it must have, therefore, meant for PHAs to have some degree of discretion to admit Cease as a new applicant under section 13661, notwithstanding her current use of medical marijuana. Otherwise, the Majority reasons, the phrase "shall establish standards" is meaningless.

The Majority's interpretive principles are unconvincing. First, the Majority does not explain how section 13661's language is ambiguous in context. Rather, the Majority compares section 13661 (*shall establish standards that prohibit*) with section 13663 (*shall prohibit*) – and based on the differences, arrives at the meaning of "*shall establish standards that prohibit*."

If statutory language is "clear and free from ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. §1921(b). Thus, when the words of a statute have a plain and unambiguous meaning, it is this meaning which is the paramount indicator of legislative intent. When interpreting federal statutes, courts must read the statutory language in its proper context and not view it in isolation. *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991). The Majority's approach in only comparing and contrasting language used in a different section of the QHWRA is directly contrary to these principles. *Roethlein v. Portnoff Law Associates, Ltd.*, 81 A.3d 816, 822 (Pa. 2013) (disapproving lower court's focus on two words).

The Majority focuses on the *presence* of the phrase "shall establish standards" in section 13661 and its *absence* in section 13663, instead of considering the plain and unambiguous language of section 13661, which is the paramount indicator of legislative intent. When the phrase is read in full and in context, it is clear that "***shall establish standards <u>that prohibit</u>***" simply and plainly means that ***whatever*** standards a PHA establishes for admission into a Section 8 housing program, those standards ***must prohibit*** admission if the applicant is determined to be illegally using a controlled substance. There is absolutely nothing ambiguous with that statement. Nevertheless, by isolating the phrase "shall establish standards" from the rest of the sentence, which describes the type of standards the PHA must establish, *i.e.*, "standards ***that prohibit***" – the Majority is able to contrive an ambiguity where none exists. This approach is in clear contravention of well-established rules of statutory interpretation.

Ironically, under the Majority's interpretation, the phrases: "shall establish standards that prohibit" (section 13661) and "shall establish standards that allow" (section 13662) – would mean the exact same thing (*i.e.*, PHAs have flexibility and discretion to admit into program and terminate tenancy) – simply because both sections include the phrase "shall establish standards." If that was the case, then the language "***that allow***" and "***that prohibit***" which follows "shall establish standards" would be rendered entirely meaningless. "The courts must construe every statute, if possible, to give effect to all of its provisions so that none are rendered mere surplusage." *White v. Associates in Counseling & Child Guidance, Inc.*, 767 A.2d 638, 642 (Pa. Cmwlth. 2001) (citing 1 Pa.C.S. §§1921(a) and 1922(a)).

Even if there was an ambiguity, which I submit there is not, I disagree with the Majority's view that the language in section 13661 ("***shall establish standards that prohibit***") is so dissimilar to the language in section 13663 ("***shall prohibit***") – such that we can conclude that Congress intended dissimilar results. There is no reason in law or logic to construe section 13661 in a different manner than section 13663. The phrase "***shall establish standards that prohibit***" in section 13661 is no less definite than the language used in section 13663 ("***shall prohibit***"). Substantively, ***establishing standards that prohibit*** is precisely the same in legal effect as ***prohibiting*** outright. It is a distinction without a difference.

Finally, applying the Majority's own logic, if Congress wanted to give PHAs discretion under section 13661 to ***allow*** drug users ***admission*** to Section 8 housing, it would have used the same language it used in section 13662 to grant that discretion, which states that a PHA "***shall establish standards that allow***" the PHA to terminate an existing tenancy for any household with a member who the PHA determines is illegally using a controlled substance . . . ." 42 U.S.C. §13662(a)(1). However, Congress did not include such language in section 13661. Instead it used "***that prohibit***," which has the exact opposite meaning of "***that allow***."

It is also noteworthy that HUD's regulation, which sets forth standards for PHA tenant selection criteria, 24 C.F.R. §960.204, support the conclusion that the phrase "***establish standards that prohibit***" means that the PHA is ***required to deny*** admission to persons engaging in illegal use of drugs. "Persons engaging in illegal use of a drug" is listed ***under the regulation defining circumstances, which require the denial of admission,*** and states under no uncertain terms that the PHA is required to deny admission to persons ***engaging in illegal use of a drug***. This section of the regulations provides, in pertinent part:

**§ 960.204 Denial of admission for criminal activity or drug abuse by household members.**

*(a) <u>Required denial of admission</u>.*

* * *

*(2) <u>Persons engaging in illegal use of a drug. The PHA must establish standards that prohibit admission of a household to the PHA's public housing program if:</u>*

*(i) <u>The PHA determines that any household member is currently engaging in illegal use of a drug</u>*[7] (For purposes of this section, a household member is "currently engaged in" the criminal activity if the person has engaged in the behavior recently enough to justify a reasonable belief that the behavior is current) . . . .

24 C.F.R. §960.204(a)(2) (emphasis added.)

Subsection (a)(4) of these same regulations require PHAs to "***establish standards that prohibit admission***" to Section 8 housing ***for registered sex offenders***. If the Majority is correct that the phrase "must establish standards" means that the PHA has "discretion" or "flexibility" to make decisions, then PHAs ***would*** have discretion to admit registered sex offenders, which is directly the opposite of

---

[7] Under federal law, marijuana is a Schedule I controlled substance with "no currently accepted medical use in treatment in the United States." 21 U.S.C. §812(b)(1)(B). Significantly, Congress also has delineated those controlled substances which it does recognize as having a currently accepted medical use in the United States. These are listed in Schedules II-V. Marijuana is not listed in Schedules II-V. In other words, Congress has determined that not only is marijuana listed as a prohibited Schedule I drug, it also chose not to include it on the list of those substances that it recognizes as having any accepted medical use. *See Harrisburg Area Community College v. Pennsylvania Human Relations Commission*, ___ A.3d ___, ___ (Pa. Cmwlth. No. 654 C.D. 2019, filed Oct. 29, 2020), 2020 WL 6325864, at *4.

what the Majority is arguing based on the language in section 13663 of the QHWRA, which provides that PHAs "***shall prohibit***" admission to registered sex offenders. This pertinent section of the regulations, which relates to sex offenders, provides in part:

> (4) Persons subject to sex offender registration requirement. ***The PHA <u>must establish standards that prohibit</u> admission to the PHA's public housing program if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program***. In the screening of applicants, the PHA must perform necessary criminal history background checks in the State where the housing is located and in other States where household members are known to have resided. (See part 5, subpart J of this title for provisions concerning access to sex offender registration records.)

24 C.F.R. §960.204(a)(4) (emphasis added).

Based on the foregoing, I disagree with the Majority's interpretation of section 13661 of the QHWRA. To me, it is abundantly clear that PHAs have no discretion to admit persons who engage in the illegal use of drugs, as defined in the governing federal law. Rather, PHAs are required to deny admission to Section 8 housing if the PHA determines that the applicant or any household member is currently engaging in illegal use of drugs.

## <u>Under Federal Law, Cease is</u><br><u>Illegally Using a Controlled Substance</u>

I also disagree with the Majority's conclusion that Cease is not illegally using a controlled substance for determining her eligibility for Section 8 housing

under the QHWRA. Cease's possession and use of medical marijuana violates the CSA.

Even though medical marijuana is legal *in certain situations* under Pennsylvania law pursuant to section 2103(a) of the MMA, 35 P.S. §10231.2103(a), Congress has explicitly classified "marihuana" as an illegal Schedule I controlled substance in the CSA. Section 812(c) of the CSA, SCHEDULE I (c)(10). Along with Morphine, Peyote, LSD, and nearly 100 other Schedule I controlled substances, Congress has declared that marijuana (cannabis): (1) has a high potential for abuse; and (2) **has no currently accepted medical use in treatment in the United States**. 21 U.S.C. §812(b)(1)(A)-(C). Categorizing marijuana as a Schedule I drug reflects Congress's conclusion that marijuana "lack[s] any accepted medical use, and [that there is an] absence of any accepted safety for use in medically supervised treatment." *Gonzales v. Raich*, 545 U.S. 1, 14 (2005) (citing 21 U.S.C. §812(b)(1)); *see also United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483 (2001) (recognizing that there is no medical necessity exception to the federal prohibition against manufacturing and distributing marijuana).

Despite efforts to reclassify marijuana, it has remained a Schedule I drug since the enactment of the federal CSA. *Raich*, 545 U.S. at 14-15, n.23 (summarizing "considerable efforts," ultimately unsuccessful, to reschedule marijuana). It follows then that medical marijuana use is considered "illegally using a controlled substance" under federal law for purposes of the QHWRA. Because *Congress* has directly and unambiguously spoken in the federal QHWRA regarding the illegality of using medical marijuana, our inquiry should end here. The plain language of the QHWRA is clear and unambiguous regarding Cease's illegal use of a controlled substance. Cease's use and possession of medical marijuana is illegal

under federal law. Because Cease is an illegal drug user under the CSA, HAIC was required to deny her application for admission to Section 8 housing under section 13661 of the QHWRA, notwithstanding that Pennsylvania has legalized medical marijuana in the MMA.

In finding that the phrase "illegally using a controlled substance" is ambiguous, the Majority reasons that medical marijuana is legal in Pennsylvania and Cease is a Pennsylvania citizen. The Majority draws the distinction in this case on the principle of federalism that the states and the federal government operate in their respective sphere of governance. However, the Majority fails to recognize that, due to the applicability of a federal statute, we are bound to interpret the QHWRA in accordance with federal law, as it is inherently a matter of federal concern. The maxim that "[f]ederalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect," *Arizona v. United States,* 567 U.S. 387, 398 (2012), cuts both ways.

The Majority also overstates the breadth of the MMA. Contrary to the Majority's position, the MMA has not made medical marijuana legal in Pennsylvania in every situation. It only legalized it to the extent that the legislature has declared it so. Section 304(a) of the MMA states that "*[e]xcept as provided in section 303, section 704, Chapter 19 or Chapter 20 [of the MMA], the use of medical marijuana is unlawful and shall, in addition to any other penalty provided by law, be deemed a violation of the Act of April 14, 1972 (P.L. 233, No. 64), [as amended, 35 P.S. §§780.101-780.144,] known as the Controlled Substance, Drug, Device and Cosmetic Act.*" (emphasis added.)

The Majority also believes the CSA is based on the "obsolete and scientifically flawed" premise that marijuana has no currently accepted medical use in treatment in the United States and there is a lack of accepted safety or use of marijuana under medical supervision. The Majority oversteps its bounds. Although the Majority feels that the United States Congress and federal administrative bodies "got it wrong" when drafting the federal statutes and regulations – it is not for this Court to hold marijuana should be considered a medically-acceptable drug, as a matter of federal law, or that marijuana should be removed as an illegal substance in the federal CSA. Stripped of its language, the Majority essentially finds that there is no rational basis for the federal CSA and that, therefore, it is unconstitutional. This is tantamount to overruling an act of the United States Congress and well-established precedent from the United States Supreme Court which has held that Congress can regulate the possession of medicinal marijuana through the CSA pursuant to its authority under the Commerce Clause. *See Raich.*

The Majority's position simply cannot be reconciled with the Supremacy Clause of the United States Constitution,[8] which dictates that the federal law prevails over state law. The Supremacy Clause[9] prevents this Court from applying the Pennsylvania MMA to discern the meaning of "illegally using a controlled substance."

Finally, HAIC participates in a federal program under which it receives federal funds. As a condition of receiving such funds, ***it must comply with federal requirements***. By encouraging HAIC to flout the CSA, the Majority is placing HAIC's right to receive federal funding at risk.

---

[8] U.S. Const. art. 1, §8, cl. 3.

[9] U.S. Const. art. 6, cl. 2.

Congress has seen fit to exclude medical marijuana users from Section 8 housing based on its belief that medical marijuana has no medical uses. This Court cannot override Congress's clear intent to prohibit *all* marijuana users from admission into Section 8 housing for reasons that this Court has no authority to question. While sympathetic to Cease's situation, this Court—no matter how inequitable the factual scenario of a case may be—lacks the constitutional authority to do so.

For these reasons, I dissent.

_____
PATRICIA A. McCULLOUGH, Judge